Filed 4/8/25

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| THE PEOPLE, | B336656 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. LA052535) |
| v. | |
| RAMIRO MUNOZ, | |
| Defendant and Appellant. | |

        APPEAL from an order of the Superior Court of Los Angeles County, Martin L. Herscovitz, Judge. Affirmed.

        Bess Stiffelman, under appointment by the Court of Appeal, for Defendant and Appellant.

        Jonathan Grossman and Mi Kim for Pacific Juvenile Defender Center as Amicus Curiae on behalf of Defendant and Appellant.

        Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Senior Assistant Attorney General, Noah P. Hill, Supervising Deputy

Attorney General, and Steven E. Mercer, Deputy Attorney General, for Plaintiff and Respondent.

_____

## INTRODUCTION

Ramiro Munoz appeals from the superior court's order denying his petition for recall and resentencing under Penal Code section 1170, subdivision (d)(1).[1]  After a jury convicted him in 2008 of first degree murder and shooting at an occupied motor vehicle and found true firearm and gang allegations, the trial court ultimately sentenced Munoz, who was 15 years old when he committed the crimes, to a prison term of 50 years to life.

In 2023 Munoz filed a petition under section 1170, subdivision (d)(1), which authorizes defendants who were under 18 years old when they committed their crimes and who were sentenced to life without the possibility of parole (which some courts refer to as LWOP) to petition for resentencing.  Munoz argues the superior court erred in denying his petition because, though he was not sentenced to life without the possibility of parole, his sentence of 50 years to life is the functional equivalent of life without the possibility of parole, which makes him eligible for relief under the statute.  We conclude that Munoz's sentence is not the functional equivalent of life without the possibility of parole and that the superior court did not err in denying his petition under section 1170, subdivision (d)(1).  Therefore, we affirm.

_____

[1]     Statutory references are to the Penal Code.

# FACTUAL AND PROCEDURAL BACKGROUND

### A.    *A Jury Convicts Munoz of Murder, and the Trial Court Sentences and Resentences Him*

In 2006 Munoz, a member of a criminal street gang, killed Marcos Juarez by shooting him in the head and neck, for no apparent reason other than Munoz thought Juarez belonged to a (presumably, rival) gang.  Juarez was not a member of a gang; he was just driving with his cousins to a family gathering.  (*People v. Munoz* (Apr. 13, 2009, B207341) [nonpub. opn.].)

A jury found Munoz guilty of first degree murder (§ 187, subd. (a)) and shooting at an occupied motor vehicle (§ 246) and found true firearm (§ 12022.53, subds. (b)-(d)) and gang (§ 186.22, subd. (b)(1)) allegations.  (*People v. Munoz, supra*, B207341.)  The trial court sentenced Munoz to a prison term of 10 years, plus 50 years to life.  Munoz appealed, and we affirmed his convictions.  We held, however, the trial court erred in imposing a 10-year gang enhancement.  The trial court resentenced Munoz to a prison term of 50 years to life.

### B.    *Munoz Files a Petition Under Section 1170, Subdivision (d)(1), and the Superior Court Denies It*

In 2023, after serving 15 years of his sentence, Munoz filed a petition for resentencing under section 1170, subdivision (d)(1).  The superior court denied the petition, stating Munoz would be

eligible for parole under section 3051 in 2029, when he will be 39 years old.[2]  Munoz timely appealed.

At oral argument the People agreed with Munoz that his sentence is the functional equivalent of a sentence of life without the possibility of parole and that denying his petition would violate his equal protection rights.  We asked the parties to submit supplemental briefing on whether the Legislature, in enacting section 1170, subdivision (d)(1), had a rational basis for distinguishing between juvenile offenders sentenced to prison for life without the possibility of parole and juvenile offenders sentenced to prison for 50 years to life.  We also asked the parties to address whether *People v. Sorto* (2024) 104 Cal.App.5th 435 and *People v. Heard* (2022) 83 Cal.App.5th 608 (*Heard*), which held denying juvenile offenders sentenced to the functional equivalent of life without parole the opportunity to petition for resentencing under section 1170, subdivision (d), violates equal protection (*Sorto*, at p. 454; *Heard*, at p. 626), should "be limited to sentences that will without doubt exceed a juvenile offender's natural life."

---

[2]     Section 3051 provides the Board of Parole Hearings must hold a parole hearing for certain juvenile offenders after the person has served 15, 20, or 25 years of his or her sentence, depending on the person's "'controlling offense,'" which the statute defines as "the offense or enhancement for which any sentencing court imposed the longest term of imprisonment." (§ 3051, subds. (a), (b); see *People v. Franklin* (2016) 63 Cal.4th 261, 277.)

## DISCUSSION

Munoz argues that his sentence of 50 years to life is "a de facto LWOP sentence under the law" and that he "was therefore entitled to petition to recall his sentence" under section 1170, subdivision (d)(1). Neither argument has merit.

A.     *Section 1170, Subdivision (d)(1), and Section 3051*

Section 1170, subdivision (d)(1)(A), provides (with certain exceptions not relevant here): "When a defendant who was under 18 years of age at the time of the commission of the offense for which the defendant was sentenced to imprisonment for life without the possibility of parole has been incarcerated for at least 15 years, the defendant may submit to the sentencing court a petition for recall and resentencing." (See *In re Kirchner* (2017) 2 Cal.5th 1040, 1049-1050; *People v. Superior Court (Valdez)* (2025) 108 Cal.App.5th 791, 794 (*Valdez*).) The Legislature in 2012 enacted Senate Bill No. 9 (effective January 1, 2013), which added section 1170, subdivision (d)(2), the predecessor to section 1170, subdivision (d)(1),[3] out of concern for juvenile offenders who were sentenced to life without the possibility of parole. (See Assem. Com. on Public Safety, Analysis of Sen. Bill No. 9 (2011-2012 Reg. Sess.) as amended May 27, 2011, p. 7.) Among the reasons the Legislature enacted the provision were two decisions by the United States Supreme Court, *Roper v.*

---

[3]     Effective January 1, 2022, the Legislature redesignated section 1170, subdivision (d)(2), to section 1170, subdivision (d)(1). (Stats. 2021, ch. 731, § 1.3.) We will use the statutory designation in effect at the time Munoz filed his petition.

5

*Simmons* (2005) 543 U.S. 551 and *Graham v. Florida* (2010) 560 U.S. 48 (*Graham*). (Assem. Com. on Public Safety Analysis, *supra*, p. 10.)

In *Roper v. Simmons*, *supra*, 543 U.S. 551 the United States Supreme Court, citing differences between juveniles and adults that demonstrated "juvenile offenders cannot with reliability be classified among the worst offenders," held "the death penalty cannot be imposed upon juvenile offenders." (*Id.* at pp. 569, 575.) In *Graham*, *supra*, 560 U.S. 48 the United States Supreme Court held that, "for a juvenile offender who did not commit homicide, the Eighth Amendment forbids the sentence of life without parole" and that the state must give juvenile offenders "some meaningful opportunity to obtain release based on demonstrated maturity and rehabilitation." (*Id.* at pp. 74, 75.) And in *Miller v. Alabama* (2012) 567 U.S. 460, decided while Senate Bill No. 9 was pending in the Legislature (approximately three months before the Governor signed it), the United States Supreme Court held that "the Eighth Amendment forbids a sentencing scheme that mandates life in prison without possibility of parole for juvenile offenders" and that "a judge or jury must have the opportunity to consider mitigating circumstances before imposing the harshest possible penalty for juveniles," including "their age and age-related characteristics and the nature of their crimes." (*Id.* at pp. 479, 489.)

Soon after *Miller* the California Supreme Court decided *People v. Caballero* (2012) 55 Cal.4th 262. In *Caballero* the trial court sentenced the defendant, who had been convicted on three counts of attempted murder, to an aggregate prison term of 110 years to life. (*Id.* at p. 265.) Relying on *Graham, supra,* 560 U.S. 48, the California Supreme Court held "sentencing a

6

juvenile offender for a nonhomicide offense to a term of years with a parole eligibility date that falls outside the juvenile offender's natural life expectancy constitutes cruel and unusual punishment in violation of the Eighth Amendment." (*Caballero*, at p. 268.)[4]

Echoing language from *Graham*, *supra*, 560 U.S. at page 68, the author of Senate Bill No. 9 stated: "'The sentence of life without parole is a sentence intended for the worst of the worst criminals and crimes. As such, it is inappropriate for juveniles.'" (Assem. Com. on Public Safety Analysis, *supra*, p. 7.) The legislative analyses concluded "sentencing minors to die in prison is barbaric" (Assem. Com. on Appropriations, Analysis of Sen. Bill No. 9 (2011-2012 Reg. Sess.) as amended Aug. 15, 2011, p. 2), observed there was "no system of review for these cases" (Assem. Com. on Public Safety Analysis, *supra*, p. 7), and discussed the proposed remedy of recall and resentencing that, if appropriate, "would result in a life sentence, but one with the possibility of parole" (Assem. Com. on Appropriations Analysis, *supra*, p. 2).

The same year Senate Bill No. 9 became law (2013), the Legislature enacted section 3051 "to bring California juvenile sentencing law into line with *Graham*, *Miller*, and *Caballero*."

---

[4] The author of Senate Bill No. 9 introduced the legislation in December 2010, and the legislative committees did most of their analyses in 2011. Although the legislative history of section 1170, subdivision (d)(1), does not refer to *Miller* or *Caballero*, we presume the Legislature was aware of them. (See *People v. Frahs* (2020) 9 Cal.5th 618, 634 ["the Legislature 'is deemed to be aware of existing laws and judicial constructions in effect at the time legislation is enacted'"].)

(*People v. Hardin* (2024) 15 Cal.5th 834, 845; see Stats. 2013, ch. 312, § 4.) "As initially enacted, section 3051 provided youth offender parole hearings only for juvenile offenders incarcerated for crimes committed before the age of 18" and "excluded several categories of individuals, including juvenile offenders sentenced to life without possibility of parole." (*Hardin*, at p. 845; see former § 3051, subds. (a)(1), (h).) In 2017 the Legislature "expanded section 3051 to include juvenile offenders sentenced to life without parole, making them eligible for youth offender parole hearings after their 25th year of incarceration." (*Hardin*, at p. 845; see Stats. 2017, ch. 684, § 1.5.)[5] In *People v. Franklin* (2016) 63 Cal.4th 261 the Supreme Court held that section 3051 and related statutes "effectively reformed" the defendant's sentence of 50 years to life to a sentence of 25 years to life and that, by "operation of law," the defendant's sentence was "not functionally equivalent" to a sentence of life without the possibility of parole. (*Franklin*, at pp. 286-287.)[6]

---

[5] In 2017 the Legislature also "raised the age of eligibility for youth offender parole hearings" to include "most offenders 25 years old or younger." (*People v. Williams* (2024) 17 Cal.5th 99, 115; see Stats. 2017, ch. 675, § 1.)

[6] The Supreme Court also stated that, "[i]n light of this holding, we need not decide whether a life sentence with parole eligibility after 50 years of incarceration is the functional equivalent of an LWOP sentence . . . ." (*Franklin, supra,* 63 Cal.4th at p. 268.)

B.     *Rules of Statutory Construction and Standard of Review*

"'Statutory construction begins with the plain, commonsense meaning of the words in the statute, "because it is generally the most reliable indicator of legislative intent and purpose."' [Citation.] A statute is not to be read in isolation, but construed in context and '"with reference to the whole system of law of which it is a part so that all may be harmonized and have effect."' [Citation.] '"If there is no ambiguity or uncertainty in the language, the Legislature is presumed to have meant what it said, and we need not resort to legislative history to determine the statute's true meaning."'" (*Heard*, *supra*, 83 Cal.App.5th at pp. 622-623; see *Valdez*, *supra*, 108 Cal.App.5th at p. 800.)

"The proper interpretation of a statute is a question of law subject to de novo review. [Citation.] When the trial court applies its factual findings under a statute, we review the factual findings for substantial evidence; but the interpretation and application of the statute to those factual findings is a question of law subject to de novo review." (*People v. Harring* (2021) 69 Cal.App.5th 483, 495; see *Valdez*, *supra*, 108 Cal.App.5th at p. 800; *Heard*, *supra*, 83 Cal.App.5th at p. 622.)

C.     *Munoz Is Not Eligible for Relief Under Section 1170, Subdivision (d)(1), and 50 Years to Life Is Not the Functional Equivalent of Life Without the Possibility of Parole*

Section 1170, subdivision (d)(1), applies to juvenile offenders sentenced to life without the possibility of parole; it does not apply to any other group of defendants. (See *Valdez*, *supra*, 108 Cal.App.5th at p. 800 ["By its terms, subdivision (d) of

9

section 1170 limits relief to juvenile defendants who were either originally sentenced to LWOP or resentenced to LWOP upon petitioning for resentencing under section 1170(d)(1)."]; *Heard, supra*, 83 Cal.App.5th at p. 626 ["section 1170, subdivision (d)(1)(A), limits eligibility to petition for recall and resentencing to juvenile offenders sentenced to an explicitly designated life without parole term"].)  Notwithstanding the clear statutory language, Munoz argues that, under the court's decision in *Heard*, he is eligible for relief because his sentence of 50 years to life is the "functional equivalent" of a sentence of life without the possibility of parole.  It isn't, and *Heard* is distinguishable.

In *Heard, supra*, 83 Cal.App.5th 608 the defendant argued that he was eligible for relief under section 1170, subdivision (d)(1), because his sentence of 23 years, plus 80 years to life, was the "functional equivalent of life without parole" and that "a contrary interpretation" would violate his "constitutional right to equal protection of the laws." (*Heard*, at p. 612.)  As discussed, the court in *Heard* held section 1170, subdivision (d)(1), applies only to juvenile offenders sentenced to "actual life without parole." (*Heard*, at p. 622, italics and capitalization omitted.)  The court held, however, that because the defendant "would have to serve 103 years before becoming parole eligible," his sentence "constitutes a de facto life without parole sentence" and that denying him "the opportunity to petition for resentencing under this provision violates his right to equal protection of the laws." (*Id.* at pp. 629, 634.)

The minimum parole eligibility of Munoz's sentence (50 years), however, is less than half the defendant's in *Heard* (103 years).  The other cases Munoz cites also involved sentences with minimum parole eligibility dates much greater than

50 years.  (See *People v. Bagsby* (2024) 106 Cal.App.5th 1040, 1047, [67 years, plus 40 years to life]; *People v. Sorto*, *supra*, 104 Cal.App.5th at p. 440 [10 years, plus 130 years to life]; *People v. Mendez* (2010) 188 Cal.App.4th 47, 63 [sentence where the defendant would not be eligible for parole until he was 88 years old was "'materially indistinguishable'" from a sentence of life without parole].)  Munoz's sentence is quantitatively different from the sentences in those cases.

Moreover, other than citing *Caballero*, *supra*, 55 Cal.4th at page 268 and presumably recognizing that most people (let alone most inmates) do not live to 103 (or, in the case of the 15-year-old defendant in *Heard*, 118), the court in *Heard* did not discuss how to calculate whether a defendant's sentence is the functional equivalent of life without the possibility of parole (or whether, in non-obvious cases, a court should be making that calculation). (*Heard*, *supra*, 83 Cal.App.5th at p. 629.)  The Supreme Court in *Caballero*, however, gave some guidance, although in an Eighth Amendment, nonhomicide context.  In *Caballero* the Supreme Court, concluding a defendant who "will become parole eligible over 100 years from now" was serving "the functional equivalent of a life without parole sentence," stated that the defendant "would have no opportunity to 'demonstrate growth and maturity' to try to secure his release" and that, under *Graham* "a state must provide a juvenile offender 'with some realistic opportunity to obtain release' from prison during his or her expected lifetime."  (*Caballero*, at p. 268.)  In contrast to the defendant in *Caballero*, Munoz will be 65 years old when he becomes eligible for parole (putting aside any hearing he may receive under section 3051) and will have a realistic opportunity to obtain release from prison during his expected lifetime.

11

Munoz, supporting amicus, and the dissent cite from a range of studies, statistical analyses, law review articles, "social science research studies," and online publications and reports by private and public entities and authors.[7]  Based on the "empirical evidence" in these studies and articles, Munoz claims his sentence of 50 years to life "means that [he] will likely die in prison before reaching his normal parole eligibility date."  Because Munoz did not present these data in the superior court, we cannot evaluate their untested validity and do not consider them.  (See *Hardin, supra*, 15 Cal.5th at p. 862 ["To strike down an act of the Legislature as irrational based on a set of untested empirical findings would be antithetical to multiple settled principles of judicial review."]; *People v. DePriest* (2007) 42 Cal.4th 1, 58 [The concept of "life in prison with no possibility of parole is clear.  [Citation.]  We are not persuaded by empirical claims made outside the appellate record and untested at trial suggesting the contrary is true."].)  Even *People v. Contreras* (2018) 4 Cal.5th 349 (*Contreras*), on which Munoz and the dissent primarily rely, cautioned against basing decisions about the legality of a sentence on "statistical life expectancies" and "decline[d] to adopt a constitutional rule that employs a concept of life expectancy whose meaning depends on the facts presented in each case," particularly where the record "contains no findings by the trial court on these matters."  (*Id.* at pp. 363, 364; see *id.* at p. 364 [quoting *State v. Null* (Iowa 2013) 836 N.W.2d 41, 71 for the proposition, "'[W]e do not believe the determination of whether the principles of *Miller* or *Graham* apply in a given case

---

[7]     Much more than "demographic data contained in reports of governmental entities."  (Dis. opn., *post*, at p. 6.)

should turn on the niceties of epidemiology, genetic analysis, or actuarial sciences in determining precise mortality dates.'"].)[8]

In addition, it is typically the function of the Legislature, not the courts, to sift through studies and research and to make policy decisions. (See *Michael Leslie Productions, Inc. v. City of Los Angeles* (2012) 207 Cal.App.4th 1011, 1026 ["'It is a legislative function to consider data, opinion, and arguments, and then to exercise discretion guided by considerations of the public welfare.'"]; see also *People v. Raybon* (2021) 11 Cal.5th 1056, 1084 ["'the choice among competing policy considerations in enacting laws is a legislative function'"].) Indeed, before enacting section 1170, subdivision (d)(1), the Legislature did exactly that. (See Sen. Com. on Public Safety, Analysis of Sen. Bill No. 9 (2011-2012 Reg. Sess.) as introduced Dec. 6, 2010, p. 7 [stating that sentencing juvenile offenders to life without parole "ignores neuroscience and well-accepted understandings of adolescent

---

[8]     For example, in concluding "a substantial percentage of juvenile offenders [sentenced to 50 years to life] will die in prison or be released at the end of their lifetimes" (dis. opn., *post*, at p. 9), the dissent relies on "demographic facts" from the California Correctional Health Care Services showing 415 of 162,200 inmates died in 2010, with an average age at death of 54 (see https://cchcs.ca.gov [as of Apr. 8, 2025], archived at https://perma.cc/4CY6-48G5) and cites the 20-year difference between this average age of death and the life expectancy of a 16-year-old boy in 2010. (Dis. opn., *post*, at pp. 4-5, 8-9.) As the dissent acknowledges, however, an average age of death of 54 does not mean any individual prisoner can only expect to live to 54. (*Post*, at p. 9, fn. 6.) Drawing inferences from these statistical data, without considering that the prison population is generally younger than the general population, is fraught with peril, particularly for an appellate court.

13

development"]; Assem. Com. on Public Safety Analysis, *supra*, pp. 7-8 [citing research by Human Rights Watch that approximately 45 percent of youth offenders serving sentences of life without the possibility of parole "were convicted of murder but were not the ones to actually commit the murder" and that, in nearly 70 percent of cases where the youth offender was not acting alone, at least one codefendant was an adult]; *id.* at p. 8 [citing a "national study" that estimated 59 percent of youth offenders sentenced to life without the possibility of parole have no prior criminal history].)

To be sure, line drawing is difficult. A sentence of 50 to life is not the functional equivalent of life without the possibility of parole, but sentences of 88 to life, 103 to life, 107 to life, and 140 to life are. What about 60 to life for a 15-year-old defendant? Or 53 years eight months to life for a 20-year-old defendant? These are tough questions. But they are questions for the Legislature, which in our current system of government has responsibility for addressing such criminological problems by evaluating potential solutions and drawing lines. (See, e.g., *People v. Cervantes* (2020) 44 Cal.App.5th 884, 888 [the Legislature's "decision not to include manslaughter in [former] section 1170.95 falls within the Legislature's 'line-drawing' authority"]; *People v. Martinez* (1999) 76 Cal.App.4th 489, 495 ["[l]ines must be drawn somewhere," and in setting forth the "gradations of punishment" in section 12022.53, subdivision (d), "the Legislature has reasonably drawn the line at great bodily injury"].) And the Legislature's "considerable latitude in defining and setting the consequences of criminal offenses" (*Johnson v. Department of Justice* (2015) 60 Cal.4th 871, 887) is even greater where the Legislature has chosen to provide ameliorative relief to

14

some but not all defendants serving lengthy prison sentences. (See *People v. Paige* (2020) 51 Cal.App.5th 194, 205 ["'When the Legislature reforms one area of the law, it is not required to reform other areas of the law.'"]; *Cervantes*, at p. 888 [the Legislature "may elect to make reforms ""one step at a time, addressing itself to the phase of the problem which seems most acute to the legislative mind"""]; *People v. Acosta* (2015) 242 Cal.App.4th 521, 528 ["'Nothing compels the state "to choose between attacking every aspect of a problem or not attacking the problem at all."'"].)  In enacting section 1170, subdivision (d), the Legislature drew a line at life without the possibility of parole; it can draw other lines if it wants to.

*Contreras, supra*, 4 Cal.5th 349 is not to the contrary.  In *Contreras* two juvenile defendants were convicted of kidnapping and sexual offenses, and the trial court sentenced one of them to two consecutive terms of 25 years to life and the other to eight years, plus two consecutive terms of 25 years to life.  (*Id.* at pp. 358, 415.)  In evaluating whether the defendants' sentences violated the Eighth Amendment, the Supreme Court held "the proper starting point is not a life expectancy table but the reasoning of the high court in *Graham*."  (*Id.* at p. 364.)  The Supreme Court stated *Graham* prohibits states from "'making the judgment at the outset'" that juvenile offenders "'who commit truly horrifying crimes'" will never "'be fit to reenter society.'" (*Id.* at p. 367.)  The Supreme Court concluded "a sentence of 50 years to life is functionally equivalent to LWOP" and violated "the Eighth Amendment under the standards articulated in *Graham*."  (*Id.* at pp. 369, 379.)

The defendants in *Contreras*, however, did not commit murder, which was an integral part of the Supreme Court's

15

analysis. (See, e.g., *Contreras*, *supra*, 4 Cal.5th at p. 365 ["Central to [*Graham*'s] analysis was its 'consideration of the culpability of the offenders at issue in light of their crimes and characteristics, along with the severity of the punishment in question.'"]; *id.* at p. 369 [sentence of 50 years to life was "a highly severe punishment for a juvenile nonhomicide offender" who, "'when compared to an adult murderer,' has 'a twice diminished moral culpability'"]; see also *Graham*, *supra*, 560 U.S. at p. 69 ["There is a line 'between homicide and other serious violent offenses against the individual.'"].)

Moreover, the Supreme Court in *Contreras* considered only whether the defendants' sentences violated the Eighth Amendment. (See *Contreras*, *supra*, 4 Cal.5th at p. 360 ["The question here is whether [the] sentence of 50 years to life or [the] sentence of 58 years to life for nonhomicide offenses violates the same Eighth Amendment principles that bar the imposition of LWOP for their crimes."].) Munoz does not argue his sentence is cruel and unusual under the Eighth Amendment.[9] The Supreme Court in *Contreras* did not address whether a sentence of 50 years to life for a juvenile offender who committed homicide is the functional equivalent of life without parole for purposes of eligibility under section 1170, subdivision (d)(1). (See *Hardin*, *supra*, 15 Cal.5th at p. 863 [although the Supreme Court has used the description "'functional equivalent of a life without

---

[9] The youth parole hearing that Munoz will receive in 2029 precludes that argument. (See *People v. Franklin*, *supra*, 63 Cal.4th at p. 280.) In contrast, because the defendants in *Contreras* were convicted under the one strike law, they did not qualify for a youth parole hearing. (*Contreras*, *supra*, 4 Cal.5th at p. 359; see § 3051, subd. (h).)

16

parole sentence'" in the Eighth Amendment context, the Court has "not held that a lengthy term-of-years sentence is necessarily equivalent to a life without parole sentence for all purposes"].)

Munoz also argues there is an "evolving Legislative intent" to include defendants sentenced to the functional equivalent of life without the possibility of parole among those eligible for relief under section 1170, subdivision (d)(1). According to Munoz, the Legislature, by amending section 1170, subdivision (d)(1), in 2017, after it had enacted section 3051, was "reaffirming the validity of the statute and reinforcing the statutory right and its independence from any related cures for youth offenders who did not have the possibility of parole." Though Munoz's argument is a little difficult to follow here, Munoz appears to be arguing the amendment of section 1170, subdivision (d)(1), in 2017 indicates the Legislature intended to include juvenile offenders serving sentences that were the functional equivalent of life without the possibility of parole. The language of section 1170, subdivision (d)(1), however, unambiguously limits eligibility to juvenile offenders sentenced to life without the possibility of parole. (See *People v. Ruiz* (2018) 4 Cal.5th 1100, 1106 ["'If the statutory language is unambiguous, then its plain meaning controls.'"]; *People v. Gonzales* (2024) 107 Cal.App.5th 312, 328 [same].) That the legislative purpose may have (in Munoz's words) "evolved alongside other avenues of relief for former minors and youth offenders" (an issue we do not reach) does not change the plain meaning of the statute. (See *Heard*, *supra*, 83 Cal.App.5th at p. 622.) In any event, the legislative history indicates the Legislature was aware juveniles were serving lengthy sentences that "amount[ed] to life in prison without parole" (Assem. Com. on Public Safety Analysis, *supra*, p. 10), but

17

as the statutory language reflects, the Legislature decided (first in 2013, and then in 2017) not to make such juvenile offenders eligible (yet, anyway) for relief under section 1170, subdivision (d)(1).[10]  If the Legislature's purpose "evolved," the statutory language did not reflect the evolution.

Munoz argues that, if this court concludes "the Legislature did not intend to include those with de facto LWOP, it should nevertheless find the statute's exclusion of juvenile offenders with de facto LWOP is an equal protection violation."  Munoz's sentence, however, is not the functional equivalent of life without the possibility of parole.  Munoz does not argue that, even if his sentence is not the functional equivalent of life without the possibility of parole, denying defendants like him sentenced to 50 years to life the right to petition under section 1170, subdivision (d)(1), violates equal protection.

---

[10]    The dissent asserts the Legislature's "stated intent in enacting section 1170(d)(1)" was "to ensure juvenile offenders have a meaningful opportunity for rehabilitation and reintegration into society."  (Dis. opn., *post*, at p. 2.)  This characterization overstates the Legislature's intent, which was to provide relief, not for juvenile offenders generally, but for juvenile offenders sentenced to life without the possibility of parole.

## DISPOSITION

The order denying Munoz's petition under section 1170, subdivision (d)(1), is affirmed.

SEGAL, Acting P. J.

I concur:

STONE, J.

19

FEUER, J., Dissenting

The majority concludes that Munoz's 50-years-to-life sentence is not the functional equivalent of a sentence of life without the possibility of parole (LWOP) based on its assumption that Munoz "will have a realistic opportunity to obtain release from prison during his expected lifetime" after serving 50 years in prison (i.e., at the age of 65).  (Maj. opn., *ante*, at p. 11.)  In reaching this conclusion, the majority declines to apply the Supreme Court's reasoning in *People v. Contreras* (2018) 4 Cal.5th 349, 359, 369 (*Contreras*) that "a sentence of 50 years to life is functionally equivalent to LWOP" with respect to an Eighth Amendment challenge to lengthy sentences for juvenile offenders.  Although *Contreras* was in the context of the Eighth Amendment, its reasoning must inform our decision whether a 50-years-to-life sentence is likewise functionally equivalent to an LWOP sentence for purposes of an equal protection challenge. This is especially the case with respect to Penal Code section 1170, subdivision (d)(1) (section 1170(d)(1)),[1] which was enacted in response to the principles articulated in *Graham v. Florida* (2010) 560 U.S. 48 (*Graham*)—the decision at the heart of *Contreras*.  I conclude a sentence of 50 or more years to life is the functional equivalent of an LWOP sentence.

That sentences of 50 or more years to life are functionally equivalent to LWOP sentences does not, however, resolve the question whether there is a rational basis for the Legislature to distinguish between explicit LWOP sentences and functionally equivalent LWOP sentences.  The majority is correct that the

---

[1]     Further statutory references are to the Penal Code.

Legislature may proceed incrementally in addressing a problem, for example, initially providing relief only to juvenile offenders sentenced to LWOP or equivalent terms that *with certainty* would result in the juvenile offenders never being released from prison. But given the Legislature's stated intent in enacting section 1170(d)(1) to ensure juvenile offenders have a meaningful opportunity for rehabilitation and reintegration into society in light of their immaturity and relative lack of control over their circumstances at the time of their crimes, there is no rational basis for distinguishing between juvenile offenders sentenced to LWOP and those sentenced to functionally equivalent sentences of 50 or more years to life. Further, I do not find plausible that the Legislature intended to limit resentencing relief to juvenile offenders who committed the most heinous crimes, such as special circumstances murder resulting in an LWOP sentence, and to deny juvenile offenders sentenced to functionally equivalent sentences of 50 years to life the same opportunity for resentencing relief that would enable them to become productive members of society.

I.     A *50-Years-to-Life Sentence Is Functionally Equivalent to LWOP*

The Supreme Court's holding in *Contreras* hinged on its rejection of the argument made by the Attorney General (adopted by the majority here) that "'any term of imprisonment that provides a juvenile offender with an opportunity for parole within his or her expected natural lifetime is not the functional equivalent of LWOP.'" (*Contreras, supra*, 4 Cal.5th at p. 360.) Specifically, the Supreme Court rejected the assertion that a 76.9-year life expectancy of a 16-year-old male living in the

United States in 2010 (according to a vital statistics report published by the Centers for Disease Control and Prevention) meant a juvenile offender sentenced in 2010 to 50 years to life would be released "'within his or her expected natural lifetime.'" (*Ibid.*, citing Arias, National Vital Statistics Reports, United States Life Tables (Nov. 6, 2014) vol. 63, no. 7, table 2, p. 11 (2010 U.S. Life Tables.)  Rather, life expectancies vary by gender and race and are impacted by multiple variables not reflected in the United States Census or vital statistics reports, including incarceration, income, education, region, type of community, and access to regular health care.  (*Contreras*, at pp. 361-362.)  In rejecting any reliance on life expectancy tables, the court noted studies cited by amicus curiae "showing that incarceration accelerates the aging process and results in life expectancies substantially shorter than estimates for the general population." (*Id.* at p. 362.)  Further, the court observed, considering differences in a juvenile offender's life expectancy by gender and race (for example, justifying longer sentences for females, who have longer life expectancies), would likely not "pass constitutional muster."  (*Ibid.*)

The *Contreras* court continued, "[E]ven if there were a legally and empirically sound approach to estimating life expectancy, it must be noted that a life expectancy is an average. [Citation.]  In a normal distribution, about half of a population reaches or exceeds its life expectancy, while the other half does not . . . .  An opportunity to obtain release does not seem 'meaningful' or 'realistic' within the meaning of *Graham* if the chance of living long enough to make use of that opportunity is roughly the same as a coin toss."  (*Contreras*, *supra*, 4 Cal.5th at pp. 363-364, citing *Graham, supra*, 560 U.S. at p. 82.)  Thus, the

court explained, "[W]e do not believe the outer boundary of a lawful sentence can be fixed by a concept that *by definition* would not afford a realistic opportunity for release to a substantial fraction of juvenile offenders." (*Contreras*, at p. 364.)

Munoz relies on raw data collected by the California prison system's health care services agency on recorded inmate deaths (not statistical estimates of life expectancies) that underscore the point made in *Contreras* that a substantial fraction of juvenile offenders facing sentences of 50 years to life will never be released from prison, or will be released at a time late in their lives when they will no longer have "a sufficient period to achieve reintegration as a productive and respected member of the citizenry" as envisioned by the United States Supreme Court in *Graham*. (See *Contreras, supra*, 4 Cal.5th at p. 368.)

Specifically, Munoz cites to inmate mortality reviews prepared by the California Correctional Health Care Services (CCHCS) that state the total number of deaths each year of inmates in California prisons and the ages of the inmates at death.[2] In 2010 the average age at death of inmates in California

---

[2] CCHCS provides care that includes medical, dental, and mental health services to California's incarcerated population at all 31 California Department of Corrections and Rehabilitation institutions. (See https://cchcs.ca.gov [as of April 8, 2025] archived at <https://perma.cc/7URW-P3LF>.) The CCHCS inmate mortality reviews (also called inmate death reviews) reflect mortality rates in the California prison population from 2010 to 2022. The reports are available at <https://cchcs.ca.gov/reports> [as of April 8, 2025], archived at <https://perma.cc/7URW-P3LF>. The inmate death reviews report the number of inmate deaths each year, the causes of death, and the average age of the inmates at death.

was 54 years[3]—more than 20 years shorter than the life expectancy of 76.9 years for a 15- or 16-year-old male in the United States according to the 2010 Life Tables referenced in *Contreras*. In 2011 and 2012 (when section 1170(d)(1) was enacted), the average age at death of inmates in California prisons was 55 years.[4]

The majority declines to consider these data because they were introduced on appeal and their validity was "untested" in the trial court. (Maj. opn., *ante*, at p. 12.) The majority relies principally on *People v. Hardin* (2024) 15 Cal.5th 834 (*Hardin*), in which the Supreme Court, in addressing an equal protection challenge to section 3051, declined to consider an academic study that analyzed tens of thousands of California homicide cases to

---

[3] See CCHCS, Analysis of 2010 Inmate Death Reviews—California Prison Healthcare System (Aug. 15, 2011), p. 6 <https://cchcs.ca.gov/wp-content/uploads/sites/60/2017/08/OTRES_DeathReviewAnalysisYear2010_20110815.pdf> [as of April 8, 2025], archived at <https://perma.cc/H5BK-S7XF>. As will be discussed, annual CCHCS Inmate Death Reviews are properly subject to judicial notice. (Evid. Code, §§ 452, subds. (c), (h), 459, subd. (a).)

[4] CCHCS Analysis of 2011 Inmate Death Reviews in the California Prison Healthcare System (May 12, 2012), p. 7 </https://cchcs.ca.gov/wp-content/uploads/sites/60/2017/08/OTRES_DeathReviewAnalysisYear2011_20120607.pdf.> [as of April 8, 2025], archived at <https://perma.cc/XY5J-QPY6>; Analysis of 2012 Inmate Death Reviews in the California Prison Healthcare System (Aug. 8, 2013), p. 7 </https://cchcs.ca.gov/wp-content/uploads/sites/60/2017/08/OTRES_DeathReviewAnalysisYear2012_20130808.pdf.> [as of April 8, 2025], archived at <https://perma.cc/B3WE-E6GZ >.

determine the percentage of cases in which at least one special circumstance allegation could have been alleged. (*Id.* at pp. 842, 860-862.) The *Hardin* court reasoned, "The study's findings were not litigated in the trial court, so they have never been the subject of any sort of adversarial testing that would afford us insight into either the methodology employed or the ultimate accuracy or significance of the results. To strike down an act of the Legislature as irrational based on a set of untested empirical findings would be antithetical to multiple settled principles of judicial review." (*Id.* at p. 862.)

The CCHCS data are not "findings" based on analytical methods reasonably subject to an adversarial challenge; instead, they are data compiled by a state agency recording the ages at which California inmates died. Appellate courts have routinely taken judicial notice of similar demographic data contained in reports of governmental entities and considered them in assessing constitutional claims. (See, e.g., *People v. Seumanu* (2015) 61 Cal.4th 1293, 1372-1373 [facts pertaining to delays in postconviction review of death penalty verdicts reflected in reports filed by the California Department of Corrections and Rehabilitation (CDCR), the California Commission of the Fair Administration of Justice, and the Office of the Attorney General were judicially noticeable under Evid. Code, § 452, subd. (h), and could be considered in appeal asserting Eighth Amendment violation];[5] *People v. Harris* (1984) 36 Cal.3d 36, 53-54 & fn. 8

---

[5]	In *Seumanu,* the Supreme Court took judicial notice of the CDCR's "Condemned Inmate List" that contained demographic information on each inmate, including the inmate's age at the time of the offense and sentencing date. (*People v. Seumanu,*

[taking judicial notice under Evid. Code, § 452, subd. (c), of U.S. Comptroller General's report and related studies regarding the number of "[u]ndocumented [a]liens" residing in the United States with respect to Sixth Amendment challenge to jury venire even though the report was not presented in the trial court, explaining the "documents do not involve factual questions peculiar to this case" and the Comptroller General's report "falls within the definition of official acts of the executive department of the United States"]; *Voice of San Diego v. Superior Court* (2021) 66 Cal.App.5th 669, 691, fn. 14 [taking judicial notice on court's own motion under Evid. Code, § 452, subd. (h), of U.S. Census Bureau data reflecting city populations in considering privacy impact of public disclosure of infectious disease case counts]; *Preserve Shorecliff Homeowners v. City of San Clemente* (2008) 158 Cal.App.4th 1427, 1434, 1449 [taking judicial notice of population data from California cities and counties, explaining "California courts have regularly taken judicial notice of demographic propositions far less obvious and universally known"]; *Bennett v. Livermore Unified School Dist.* (1987) 193 Cal.App.3d 1012, 1015, fn. 2 [taking judicial notice of "school population statistics" contained in a California Department of

---

*supra*, 61 Cal.4th at pp. 1372-1373 & fn. 25, citing <https://www.cdcr.ca.gov/capital-punishment/condemned-inmate-list-secure-request/> [as of April 8, 2025], archived at <https://perma.cc/PG4T-RLS9>.)  The court noted that the studies had been produced on habeas review in a different case but nonetheless distinguished between judicially noticeable facts (e.g., the CDCR report) and declarations filed in the other case. (*Seumanu*, at pp. 1372-1373.)

7

Education report showing percentage of students of specific ethnic categories].)

The average ages at death of California inmates in 2010, 2011, and 2012 reported by CCHCS are demographic facts reported by a state agency that are unchallenged by the People, require no further validation, and are relevant to this court's consideration of whether a juvenile offender sentenced to a 50-years-to-life sentence when section 1170(d)(1) was enacted would have had a meaningful opportunity to be released and become a productive member of society. The CCHCS reports are therefore the proper subject of judicial notice. (Evid. Code, §§ 452, subds. (c), (h), 459.)

In addition to CCHCS data, amicus curiae Pacific Juvenile Defender Center (PJDC) points out that serious and violent juvenile offenders are "'disproportionately victims of trauma, abuse, neglect, and maltreatment during childhood, as compared to the less severe or non-offending juvenile population,'" citing Fox, et al., *Trauma Changes Everything: Examining the Relationship Between Adverse Childhood Experiences and Serious, Violent, and Chronic Juvenile Offenders* (2015) 46 Child Abuse & Neglect, at pp. 1-2. Further, a 2020 study cited by PJDC reports that children who experience multiple adverse experiences (such as trauma) "had a 4.54 times higher all-cause mortality risk . . . than that of children with a low adversity trajectory." (Rod, et al., *Trajectories of childhood adversity and mortality in early adulthood: a population-based cohort study* 396 (No. 10249) Lancet (2020) 489-497.)

The CCHCS reports showing that from 2010 to 2012 the average age at death of inmates in California prisons was between 54 and 55 years old and the studies cited by PJDC

concerning juvenile offenders' increased mortality risk buttress a conclusion that a sentence for a 15- to 16-year-old juvenile offender of 50-years-to-life is the functional equivalent of an LWOP sentence because a substantial percentage of juvenile offenders will die in prison or be released at the end of their lifetimes, without a meaningful opportunity to become productive members of society.[6]  In this case, Munoz was sentenced to a prison term that, at the time of sentencing, would not have afforded him an opportunity for parole until the age of 65.[7]  And

---

[6]　I do not suggest the data showing the average age at death of California inmates from 2010 through 2012 reflect the life expectancies of juvenile offenders sentenced to prison during that time period (or 15 to 17 years earlier).  The average age at death of inmates in California prisons could be affected, for example, by the distribution of the prison population by age during those years.  But the data are consistent with studies showing that life expectancies of prison inmates are significantly shorter than those of the general population in light of the inmates' gender, race, economic status, childhood trauma, access to health care, incarceration, and other factors.

[7]　As the majority observes, Munoz was sentenced before section 3051 was enacted, which provides a parole hearing after a juvenile offender serves 15, 20, or 25 years, depending on the controlling offense.  (Maj. opn., *ante*, p. 4, fn. 2.)  I agree with *People v. Sorto* (2024) 104 Cal.App.5th 435, 448 and *People v. Heard* (2022) 83 Cal.App.5th 608, 629 that enactment of section 3051 does not render a juvenile offender's equal protection challenge to section 1170(d)(1) moot because a juvenile offender is eligible for relief if the offender "was sentenced" to LWOP.  (Cf. *People v. Superior Court (Valdez)* (2025) 108 Cal.App.5th 791, 801 [defendant was not entitled to resentencing under § 1170(d)(1) where he was resentenced "after

as the *Contreras* court observed, given that life expectancy depends on an individual's race and gender as well as other factors (including income, education, and childhood community), whether a 50-years-to-life sentence for a juvenile offender would exceed an individual offender's life expectancy would depend entirely on factors not relevant to the individual's culpability and likelihood of rehabilitation.

Moreover, as the *Contreras* court reasoned, "Even assuming defendants' parole eligibility dates are within their expected lifespans, the chance for release would come near the end of their lives." (*Contreras*, *supra*, 4 Cal.5th at p. 368.) Therefore, the sentences "'fall[] short of giving them the realistic chance for release'" that would enable them to be rehabilitated and become "a productive and respected member of the citizenry." (*Ibid*.) The court relied on the teaching in *Graham*, *supra*, 560 U.S. 48, that a "lawful sentence must recognize 'a juvenile nonhomicide offender's capacity for change and limited moral culpability,'" "'hope of restoration,'" "'a chance to demonstrate maturity and reform,'" a "'chance for fulfillment outside prison walls,'" a "'chance for reconciliation with society,'" "'the opportunity to

---

the enactment of section 3051, so the 50-year-to-life sentence imposed on resentencing included the availability of youth offender parole under section 3051"].)

Moreover, section 1170(d)(1) provides more significant relief than the opportunity for parole provided by section 3051. As part of resentencing under section 1170(d)(1), the trial court is vested with "broad discretion to select the term of imprisonment, run sentences concurrently or consecutively, and strike or dismiss enhancements," and resentencing relief "entitles eligible offenders to the benefits of retroactive ameliorative changes to the law." (*Sorto*, at p. 449.)

10

achieve maturity of judgment and self-recognition of human worth and potential,'" and an "'incentive to become a responsible individual.'" (*Contreras*, at p. 367.)

The majority distinguishes *Contreras* on the basis the defendants there, in contrast to Munoz, did not commit murder. (Maj. opn., *ante*, at pp. 15-16.) But the crimes the defendants in *Contreras* committed were egregious, including multiple counts of forcible rape and other sex crimes against two minor victims. (*Contreras, supra*, 4 Cal.5th at p. 357; see *People v. Williams* (2024) 17 Cal.5th 99, 119-120, 129 (*Williams*) [rejecting equal protection challenge to exclusion of One Strike law sex offenders from relief under § 3051, quoting the legislative history of amendments enhancing One Strike sentences that explained "offenders who commit '"the most serious and heinous sex crimes against children are not able to be rehabilitated"' and that these crimes '"are a red flag that the perpetrator is capable of much, much worse"'"].) As the court in *Contreras* emphasized in finding an Eighth Amendment violation, "In so holding, we do not minimize the gravity of defendants' crimes or their lasting impact on the victims and their families. No one reading the disturbing facts of this case could disagree with the trial court that the crimes were 'awful and shocking.'" (*Contreras,* at p. 380.)

In sum, 50-years-to-life sentences for juvenile offenders, which will result in a substantial percentage of juvenile offenders dying before their parole eligibility dates set at sentencing, and others being released toward the end of their lifetimes with no realistic opportunity to become productive members of society, are the functional equivalent of explicit LWOP sentences for purposes of an equal protection challenge.

11

*II.     Exclusion of Juvenile Offenders Sentenced to 50 Years to*
*Life from Resentencing Relief Under Section 1170(d)(1)*
*Violates Equal Protection*

Both the United States and California Constitutions
guarantee that no person shall be denied the equal protection of
the laws.  (U.S. Const., 14th Amend.; Cal. Const., art. I, § 7.)  "'At
core, the requirement of equal protection ensures that the
government does not treat a group of people unequally without
some justification.'"  (*Hardin, supra*, 15 Cal.5th at p. 847; accord,
*People v. Chatman* (2018) 4 Cal.5th 277, 288.)  The "pertinent
inquiry is whether the challenged difference in treatment is
adequately justified under the applicable standard of review."
(*Hardin*, at pp. 850-851; accord, *Williams, supra*, 17 Cal.5th at
p. 124; *People v. Sorto* (2024) 104 Cal.App.5th 435, 442 (*Sorto*).)

Because section 1170(d)(1) does not involve a suspect
classification or a fundamental right, we apply rational basis
review.  (*Hardin, supra*, 15 Cal.5th at p. 847; *Sorto, supra*,
104 Cal.App.5th at p. 442 [applying rational basis review to
juvenile offender's equal protection challenge to
section 1170(d)(1)]; *People v. Heard* (2022) 83 Cal.App.5th 608,
631 [same].)  "Under this deferential standard, we presume that
a given statutory classification is valid 'until the challenger
shows that no rational basis for the unequal treatment is
reasonably conceivable.'  [Citation.]  The underlying rationale for
a statutory classification need not have been 'ever actually
articulated' by lawmakers, nor 'be empirically substantiated.'
[Citation.]  Evaluating potential justifications for disparate
treatment, a court reviewing a statute under this standard must
'treat the statute's potential logic and assumptions far more
permissively than with other standards of constitutional or

12

regulatory review.'  [Citation.]  'If a plausible basis exists for the disparity, courts may not second-guess its "'wisdom, fairness, or logic.'"'"  (*Hardin,* at p. 852; accord, *Williams, supra*, 17 Cal.5th at p. 124.)  We review an equal protection claim de novo. (*California Grocers Assn. v. City of Los Angeles* (2011) 52 Cal.4th 177, 208; *People v. Morales* (2021) 67 Cal.App.5th 326, 345 [reviewing equal protection challenge to § 3051 de novo]; see *Sorto,* at p. 442 ["independently review[ing]" equal protection challenge to section 1170(d)(1).)

Determination of whether there is a plausible basis for excluding juvenile offenders sentenced to 50 or more years to life from section 1170(d)(1) is particularly challenging here, where the Legislature did not consider whether to extend section 1170(d)(1) eligibility to sentences that are functionally equivalent to explicit LWOP sentences, and the Attorney General now concedes there is no rational basis.  Nonetheless, it is Munoz's burden to show there is no plausible rational basis for the exclusion of a juvenile offender sentenced to 50 or more years to life.  (*Hardin, supra*, 15 Cal.5th at pp. 850-851.)  Munoz has met that burden.

In *Hardin*, the Supreme Court held section 3051 does not violate equal protection by denying relief to young adult offenders sentenced to explicit LWOP sentences because the Legislature could have rationally determined that LWOP young adult offenders who had committed special circumstances murder were more culpable than young adult offenders who were sentenced to functionally equivalent LWOP sentences without a special-circumstances finding.  (*Hardin, supra*, 15 Cal.5th at pp. 863-864.)  By contrast, juvenile offenders sentenced to 50-years-to-life sentences without a special circumstance finding are *less* culpable

13

than juvenile offenders sentenced to LWOP.  Thus, the culpability of the juvenile offender is not a plausible basis for excluding juvenile offenders sentenced to 50 years or more to life from resentencing relief under section 1170(d)(1).  (See *People v. Heard, supra*, 83 Cal.App.5th at p. 633 [rejecting culpability as a rational basis for excluding functionally equivalent LWOP sentences from section 1170(d)(1) relief because this would have "the incongruous effect of extending sentencing leniency exclusively to the category of offenders generally regarded as the least deserving of it"]; accord, *Sorto, supra*, 104 Cal.App.5th at p. 446.)

The majority suggests, albeit in the context of functional equivalence, that the Legislature could have taken an incremental approach in deciding where to draw the line for which juvenile offenders are eligible for resentencing relief by first addressing juvenile offenders sentenced to explicit LWOP sentences (who with certainty will die in prison without any chance of release).  (Maj. opn., *ante*, at pp. 14-15.)  As the Supreme Court explained in *Hardin, supra*, 15 Cal.5th at page 866 with respect to the defendant's equal protection challenge to section 3051, "[T]he legislative branch is entitled to proceed incrementally, so long as it proceeds rationally, in 'walking [the] tightrope' of the political process."  (See *Williams, supra*, 17 Cal.5th at p. 125 ["'Nothing compels the state "to choose between attacking every aspect of a problem or not attacking the problem at all"'"]; *Kasler v. Lockyer* (2000) 23 Cal.4th 472, 488 [the Legislature may take reform ""one step at a time, addressing itself to the phase of the problem which seems most acute to the legislative mind"""].)

14

However, the cases relied on by the majority that rejected equal protection challenges based on the Legislature's line-drawing authority are distinguishable because they involved the constitutionality of disparate punishments for different offenses; in each case, the courts concluded the distinctions were consistent with the intent of the Legislature or the electorate. (See, e.g., *People v. Cervantes* (2020) 44 Cal.App.5th 884, 888 [Legislature could have reasonably decided to provide resentencing relief under former section 1170.95 for murder but not voluntary manslaughter based on "legislative focus [that] was centered on the unfairness of the felony murder rule," and it could rationally have decided that "the punishment for voluntary manslaughter was appropriate, but the punishment for murder based on the felony murder rule could be excessive"]); *People v. Acosta* (2015) 242 Cal.App.4th 521, 528 [rejecting equal protection challenge to Proposition 47's misdemeanor punishment for theft of a motor vehicle (with a loss not exceeding $950) and felony punishment for attempted burglary of a vehicle, explaining among other rationales, "the electorate could rationally conclude that car burglary should be treated more harshly because entry must be made into a locked vehicle, an element not required of vehicle theft"].)[8]

---

[8]     *People v. Martinez* (1999) 76 Cal.App.4th 489, 493-494, also cited by the majority, involved an Eighth Amendment challenge to a gun enhancement under section 12022.53.  *People v. Paige* (2020) 51 Cal.App.5th 194, 206 concluded the exclusion of voluntary manslaughter from resentencing relief under section 1170.95 did not violate equal protection, relying on the reasoning in *Cervantes, supra*, 44 Cal.App.5th 884.

15

Excluding functionally equivalent LWOP sentences from section 1170(d)(1) is inconsistent with legislative intent. As the legislative history reflects, the Legislature intended that section 1170(d)(1) provide resentencing relief to juvenile offenders because "the adolescent brain is still developing an ability to comprehend consequences and control impulses"; a long sentence does not act as a deterrent; "their irresponsible conduct is not as morally reprehensible as that of an adult"; and they "have a unique capacity to change and rehabilitate." (Assem. Com. on Public Safety, Analysis of Sen. Bill 9, as amended May 27, 2011, pp. 7-8; see *id.* at p. 8 ["'Recognizing that teenagers are still maturing at the time of their original sentencing, and recognizing that our legal process sometimes results in unfair sentences, this Act creates specific criteria and an intense, three-part review process that would result in the possibility of a lesser sentence for those offenders whose crimes were less than their sentence might have warranted and who have proven themselves to have changed as adults."].)

Further, the legislative history addresses the evolution of the United States Supreme Court's decisions concerning juvenile offender sentences, citing *Roper v. Simmons* (2005) 543 U.S. 551 and *Graham, supra*, 560 U.S. at page 75 and emphasizing the language in *Graham* that a juvenile offender must have "'some meaningful opportunity to obtain release based on demonstrated maturity and rehabilitation.'" (Assem. Com. on Public Safety, Analysis of Sen. Bill 9, as amended May 27, 2011, p. 10, italics omitted.) As discussed, at the time section 1170(d)(1) was enacted, juvenile offenders with functionally equivalent LWOP sentences, like explicit LWOP offenders, did not have a

16

meaningful opportunity to obtain release and reintegrate into society as productive members.

Moreover, we do not simply consider whether it is *possible* the Legislature had a purpose in distinguishing between juvenile offenders who will certainly die in prison and those who are likely to die in prison or be released at the end of their lifetimes, but rather, whether it is *plausible* the Legislature intended to make this distinction consistent with the Legislature's intent in enacting section 1170(d)(1). As the Supreme Court cautioned in *Williams*, "'"The realities of the subject matter cannot be completely ignored."' [Citations.] The statutory classification must be rationally related to '"realistically conceivable legislative purpose[s],"' and may not be based on 'invented fictitious purposes that could not have been within the contemplation of the Legislature.'" (*Williams, supra*, 17 Cal. 5th at p. 125.)

In light of the Legislature's intent in enacting section 1170(d)(1) to address juvenile offenders' capacity to change and be rehabilitated, it is not a "'realistically conceivable legislative purpose'" (*Williams, supra*, 17 Cal.5th at p. 125) that the Legislature intended to limit resentencing relief to juvenile offenders who commit the most heinous crimes and would with certainty otherwise die in prison, and not to the substantial fraction of juvenile offenders sentenced to 50 years to life who also will die before they are eligible for release, or the fraction of juvenile offenders who, after serving most of their lifetimes in prison, will have no realistic opportunity to reintegrate into

17

society or be incentivized to become responsible individuals.  (See *Contreras, supra*, 4 Cal.5th at pp. 368-369.)[9]

In sum, section 1170(d)(1), by affording resentencing relief to juvenile offenders sentenced to LWOP but not juvenile offenders sentenced to functionally equivalent sentences of 50 years or more to life, violates the constitutional guarantee of equal protection.  Thus, juvenile offenders like Munoz should be given an opportunity to show they meet the stringent requirements under section 1170(d)(1) for resentencing relief.

Accordingly, I respectfully dissent.

FEUER, J.

---

[9]    I also agree with *Sorto* that the cost of expansion of resentencing relief under section 1170(d)(1) to functionally equivalent LWOP juvenile offenders is not a plausible basis for excluding those offenders because "it is not apparent that extending relief to functionally equivalent LWOP offenders would have a meaningful fiscal impact."  (*Sorto, supra*, 104 Cal.App.5th at p. 452.)  In rejecting the fiscal impact argument, the *Sorto* court explained, "[A] fiscal summary by the Senate Appropriations Committee noted section 1170(d) may result in net General Fund savings, as its resentencing procedure would likely be less expensive than resolution of a petition for writ of habeas corpus.  (Sen. Appropriations Com., Fiscal Summary of Sen. Bill No. 9 (2011-2012 Reg. Sess.) May 23, 2011, p. 2.)  The summary also estimated that reducing an LWOP sentence to 25 years would result in an average cost savings of $625,000 [partially offset by parole supervision costs], far outweighing the administrative and court costs of the resentencing procedure.  (*Id.* at pp. 2-3.)  We see no reason why the same cost savings would not apply equally to functionally equivalent LWOP offenders."  (*Sorto,* at pp. 452-453, footnote omitted.)

18